**James T. PRICE, Appellant,**

v.

**The OKLAHOMA COLLEGE OF OSTEOPATHIC MEDICINE AND SURGERY, a Member of the State System of Higher Education, and the Board of Regents of the Oklahoma College of Osteopathic Medicine and Surgery, Appellees.**

**No. 64983.**

Court of Appeals of Oklahoma, Division No. 4.

Oct. 7, 1986.

Rehearing Denied Nov. 24, 1986.

Certiorari Denied Feb. 11, 1987.

Steven R. Hickman, Frasier & Frasier, Tulsa, for appellant.

Stephen L. Andrew, McCormick, Andrew & Clark, Tulsa, for appellees.

BRIGHTMIRE, Judge.

This might be called the case of the unwelcome acceptance. The ultimate issue for resolution is whether the trial judge erred when he dismissed the tenured pro-

fessor's petition seeking declaratory relief in the form of a judicial determination that plaintiff had entered into a valid teaching contract with osteopathic medical school for the 1984–85 school year. We hold he did and reverse.

## I

The essential facts are undisputed. In 1974 plaintiff, Dr. James T. Price, was appointed by the Oklahoma College of Osteopathic Medicine and Surgery to the position of Associate Professor of Pathology "with tenure." [1] Each year the college sent him a letter setting out the salary and other terms of his employment for the ensuing academic year and requesting that his acceptance be indicated by signing on a designated line and returning it to the college. Dr. Price complied with the request annually, sometimes "under protest" as he did in

1982 and sometimes with explanation of his objections as he did in 1983 and 1984. The 1982 protest, for instance, was aired in a grievance hearing before a review committee and narrative minutes of the hearing show that the committee proceeded on the premise that a valid 1982–83 contract existed and restricted its concern to the merits of the protest. Certainly no one suggested his criticism of administrative policies and procedures, written below his acceptance of the 1983 appointment letter, was to be treated as a counteroffer. [2]

But in 1984, something different happened. In June Dr. Price received the usual appointing letter from the college administration. And, as usual, he signed it, added a protest note and returned it to the college. The letter is reproduced below:

---

**1.** "Tenure" in the academic community commonly refers to status granted, usually after probationary period, which protects teacher from dismissal except for serious misconduct, incompetence, financial exigency, or change in institutional programs. *Stensrud v. Mayville State College,* 368 N.W.2d 519 (N.D.1985).

"Tenure" is status which protects professional from dismissal, except for incompetence or serious misconduct. *Keiser v. State Bd. of Regents of Higher Ed.,* 630 P.2d 194 (Mont.1981).

To same effect see *Drans v. Providence College,* 119 R.I. 845, 383 A.2d 1033 (1978); *Zumwalt v. Trustees of Cal. State Colleges,* 109 Cal. Rptr. 344, 33 Cal.App.3d 665 (1973); *Collins v.*

*Parsons College,* 60 A.L.R.3d 218, 203 N.W.2d 594 (Iowa 1973).

**2.** The protest, criticism and advice written by Dr. Price on the 1983 acceptance letter below his signature is as follows:

"The enclosed Personnel Policy contains referrences [sic] to positions of authority that no longer exist and Policies that have not been followed by the Administration in the past. Personnel Policy Dated July '83 cannot, in whole, apply. Did you send the right Policy? I agree to policy for employement but feel you will have to renew your part."

# THE OKLAHOMA COLLEGE OF
# OSTEOPATHIC MEDICINE AND SURGERY

*A Member of the Oklahoma State System of Higher Education*

July 1, 1984

James T. Price, Ph.D.
The Oklahoma College of Osteopathic
  Medicine and Surgery

Dear Dr. Price:

I am pleased to inform you that the Board of Regents has approved your appointment on a whole-time basis to the position of Associate Professor of Pathology for the period beginning July 1, 1984 through June 30, 1985. Salary for this appointment will amount to $47,117, with appropriate fringe benefits as more fully set forth in the attached Personnel Policy adopted by the Board of Regents and effective July 1, 1984.

Your effort in contributing to the success and quality of our educational program is sincerely appreciated by me and members of the Board of Regents.

Please indicate your acceptance of this appointment by signing and returning one copy of this letter to the Office of Personnel Services no later than June 29, 1984.

Cordially,

John Barson, Ed.D.
President

PLAINTIFF'S
EXHIBIT
1

Dear Dr. Barson:

I accept the responsibilities of the appointment under the terms outlined above.

_____        _____
            Signature                          Date

*Signed under protest that salary does not reflect garantees under present and past Personnel policies and that proper evaluation procedures were not followed.*

1111 West 17th Street • Tulsa, Oklahoma 74107 • 918 / 582-1972

---

Dr. Price received the following letter dated June 29, 1984, from Dr. Barson:

"Dear Dr. Price:
Your reply is considered as non-acceptance of the Board of Regents' appointment action of June 14, 1984. Accordingly, your voluntary decision to terminate employment will be reported to the Board at their next meeting.

Sincerely,
/s/
John Barson, Ed.D.
President"

By letter dated July 2, 1984, the professor responded this way:

"Dear Dr. Barson:

I am somewhat puzzled by your letter of 29 June 1984 that addresses my "non-acceptance" on the contract which I signed as accepting and delivered to your personnel office on 29 June.

I did sign as accepting this contract while protesting what I believe are violations of our previous contract on the part of the institution. I did this to specifically preserve options of grievance during the contract year 1984–1985.

I consider that you, serving for the Board of Regents, have offered a contract that was completed in agreement, by my returning the signed contract on the day specified.

Sincerely,
/s/
James T. Price, Ph.D.
Associate Professor"

Finally Dr. Price received the following epistle, dated July 6, 1984, from the college president:

"Dear Dr. Price:

As follow-up to my correspondence dated June 29, 1984, I wish to inform you that the Board of Regents, at its meeting on July 5, 1984, took note of your signed protest of the terms of an employment contract offered you by the Board of Regents on June 14, 1984. By approved motion, the Board of Regents declared the budget position of Associate Professor of Pathology (# 12110) which you occupied during FY 1983–84, to be vacant due to the absence of a valid contract.

In accordance with Board action, you should proceed to remove your personal effects from your office. College separation procedure requires clearance with the Physical Plant, Library, Audiovisual Department, your department supervisor, Dr. Robert Ritter, and any other unit which has issued you working materials or equipment, in order to complete our records and assure proper return of College-owned items.

Sincerely,
/s/
John Barson, Ed.D.
President"

This lawsuit was filed by the banished prof on July 17, 1984, against the college and its Board of Regents. After stating the operative facts the plaintiff asked the court to (1) declare that a legally binding contract of employment for the fiscal year 1984–85 was created when he signed the offering letter and returned it to the college personnel office on June 29, 1984; (2) determine that plaintiff is due his salary in accordance with the rules and regulations of the college; and (3) award his costs and a judgment for his attorney fee expense.

Defendants filed an answer September 18, 1984, in which they admitted the allegations of fact but denied most of the conclusions stated, including plaintiff's claim of being entitled to the relief requested.

Plaintiff moved for a judgment on the pleadings October 9, 1984. The motion was briefed by the parties and apparently overruled by the court. On July 10, 1985, defendants moved for a summary judgment stating that no material fact was in dispute and therefore they were entitled to judgment. While this motion was being briefed plaintiff moved for a summary judgment on the same grounds and fortified his request with a couple of affidavits. These motions were heard August 15, 1985. The trial court held that the protest written by plaintiff below his signature on the appointing letter "qualified his acceptance" and such "qualified acceptance of Defendants' offer of employment was a new offer for an employment contract which was not accepted by the Defendants," citing 15 O.S. 1981 § 71. Based on these legal hypotheses defendants' motion for summary judgment was sustained, plaintiff's lawsuit "dismissed," and each party ordered to pay his own attorney fees.

The professor appeals asserting that his post-acceptance declamation—"signed under protest"—rather than having a legal effect on the executed employment contract, merely preserved a grievance for po-

tential rectification through proper school-sponsored channels.

## II

The dispositive issue may be framed thus: If the acceptance of an offer is carried out in accordance with the directions of the offeror, does notification of offeror—by note written on the margin of the offeror's document below the offeree's signature—that the offeree signs or accepts the offer under protest, amount to a condition or qualification which has the legal effect of altering the terms of the offer thus transforming the acceptance into a counter proposal?

In defense of the trial court's conclusion—that the protest did just that—defendants rely on the law pertaining to the type of acceptance it takes to create an enforceable contract, namely, the provisions of 15 O.S.1981 § 71. It reads:

"An acceptance must be absolute and unqualified, or must include in itself an acceptance of that character, which the proposer can separate from the rest, and which will include the person accepting. A qualified acceptance is a new proposal."

The gist of defendants' argument is that plaintiff's "signed under protest" statement was a qualification of his acceptance because he, "in effect, responded to OCOMS' offer by stating that he accepts the offer of employment but not at the salary offered." And, defendants add, salary is a material term of the offer. The case of *Swanson v. McCall*,[3] is tendered as decisional support for the legal theory.

Surely just to state the facts and the foregoing law is sufficient to demonstrate the lack of merit in defendants' position. While one may qualify an acceptance as an act of protest, a mere protest does not in itself qualify an acceptance. And that is all we have here—an unqualified acceptance of the proffered appointment followed by a protest based on a perceived error in fixing the amount of salary agreed on.

Nor does *Swanson* help defendants. There the facts involved an interstate sale of a royalty interest in an Allen, Oklahoma oil well. Plaintiff, an Ada, Oklahoma resident, wired defendant seller, a resident of San Jose, California, on June 22, 1927, inquiring about the latter's interest in selling. On June 23 the seller wired the Oklahoman requesting an offer "for one-half of my royalty." On June 28 the Oklahoman wired an offer of "[$2,000] *cash ... at Allen.*"[4] On July 3, the seller replied "Will take $2,000. *Send money and papers to Bank of Italy*[5] [in San Jose] Notify me when paper starts." On July 7 buyer wired seller, "Just returned after 4th received your wire sending papers where is abstract." On July 9 First National Bank of Ada, at request of buyer, forwarded to Bank of Italy a mineral deed to be executed by seller and his wife together with a "customer's draft" payable subject to approval of title. The draft was rejected by seller and at his request returned to the Ada bank. The buyer sued for specific performance. The dispositive question framed by the court was whether seller's telegram of July 3 was an unconditional acceptance of buyer's June 28th offer to pay $2,000 cash at Allen. In holding it was not, the court emphasized the offer provided for closing in Allen and the acceptance called for closing at seller's bank in San Jose. Whatever may be said about the propriety of denying relief to a plaintiff who apparently had accepted the counterterms, the fact remains the court concluded that under the particular circumstances in *Swanson* the place of closing and manner of payment were indeed material terms which, in effect were rejected by the seller when he conditioned his acceptance on a place of closing and manner of payment materially different from that specified in the offer.

In sub judice case we have nothing of this sort. The college's offering letter recited the terms of the appointment and

3. 138 Okl. 67, 280 P. 427 (1929).

4. Emphasis added.

5. Emphasis added.

then specified the mode and manner of acceptance, namely, "by signing and returning one copy of this letter to the office of Personnel Services no later that June 29, 1984." Further down on the page was a signature line above which was this statement by the plaintiff to Dr. Barson: "I accept the responsibilities of the appointment *under the terms outlined above*."[6] Thus, when Dr. Price signed on the designated line he complied with the first essential and when he returned a copy of the letter to the designated office he met the second requirement at which point a binding contract came into being. No mention was there of any conditional or qualified acceptance or change of terms, but on the contrary there was only an unequivocal and specific acceptance of each and every term of the college's offer.[7] The protest language did not in tenor or letter alter or purport to alter any term of the offer; it merely articulated the offeree's opinion that one term of the offer—the salary—had not been determined in accord with "present and past personnel policies." Execution of the acceptance was precisely in the manner directed by the offeror. The note added below the acceptance was a precative protest not substantially unlike he had written on the acceptance letter in prior years. The notation amounted to no more than saying I don't like your offer, I don't think it's right or fair, but I accept it.[8] That and nothing more.

Under these circumstances, we hold that the trial judge erred in granting defendants a summary judgment.

### III

We further hold it to be an undisputed fact that a valid contract of continued tenured employment was made between OCOMS and Dr. Price on June 29, 1984. Dr. Barson's letters of response on same date and on July 6 described a wrongful repudiation of the agreement by the defendants and an unlawful termination of Dr. Price's tenured professorial position without just cause.[9] The action is, therefore, remanded to the trial court with directions to determine what relief plaintiff is entitled to and to grant him a judgment that is consistent with the conclusions of this court and such other relief as he may be entitled to under the pleadings, the law, and the evidence.

STUBBLEFIELD, P.J., and RAPP, J., concur.

---

6. Emphasis added.

7. A decisional example of an acceptance containing a term materially different than that in the offer is *Swanson v. McCall,* 138 Okl. 67, 280 P. 427 (1929), discussed earlier in this opinion.

8. For variation of this type of situation see the following cases:
   *Home Gas Co. of Cushing v. Magnolia Petroleum Co.,* 143 Okl. 112, 287 P. 1033 (1930), states that where a letter of acceptance is followed by a suggestion as to a desire to change offer in a particular way, the latter does not qualify the acceptance or vary its terms of the offer.
   *Foster v. West Publishing Co.,* 77 Okl. 114, 186 P. 1083 (1920), explains that objections, grumbling and expressions of dissatisfaction with an offer are not conditions or qualifications that affect the effect of an acceptance.
   *White v. Oliver,* 32 Okl. 479, 122 P. 156 (1912), holds that purchaser's acceptance of cattle under protest—that the cattle were of a kind inferior to what was agreed on—did not operate to affect or prevent creation of an enforceable contract.

9. Indeed, Dr. Barson's appointment letter commended Dr. Price saying, "Your effort in contributing to the success and quality of our educational program is sincerely appreciated by me and members of the Board of Regents."